UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

GABRIELLE S. DILLOW                                                                                   PLAINTIFF

v.                                                                        CIVIL ACTION NO. 3:17-CV-00353-DW

NANCY A . BERRYHILL, ACTING COMMISSIONER
SOCIAL SECURITY ADMINISTRATION                                                         DEFENDANT

**MEMORANDUM OPINION**

This matter comes before the Magistrate Judge to consider the motion for summary judgment of the Plaintiff, Gabrielle Dillow in this social security action. Dillow requests that the Court reverse the decision of the Commissioner of the Social Security Administration (Commissioner) that requires her to repay an overpayment of benefits she previously received.[1] On December 10, 2014 Administrative Law Judge (ALJ) Mary Lassy issued a hearing decision which determined that a "holding out" relationship existed between Gabrielle and her male roommate, Andrew Dillow, from December 2010 through April 2014 so that the income of Andrew was properly deemed to be that of Gabrielle for the purpose of determining her financial eligibility for Supplemental Security Income (SSI) benefits. Because Gabrielle's monthly income, when equated with that of Andrew, exceeded the amount allowed for SSI beneficiaries during this period, the Commissioner found that Gabrielle was liable for the repayment of a $28,542 in SSI benefits overpaid her during the relevant 2010-2014 time frame.

Plaintiff Dillow now challenges the final decision of the Commissioner. She argues first that the 2014 hearing decision of ALJ Lassy, which was adopted by the Commissioner, applies

---

[1] (DN 12, Motion for Summary Judgment).

1

the incorrect legal standard to determine whether Gabrielle and Andrew Dillow were holding themselves out as husband and wife. Second, Plaintiff argues in the alternative that, even if the ALJ did apply the correct legal standard, the hearing decision nevertheless is not supported by substantial evidence. The Commissioner has filed a Fact and Law Summary (FLS) in which she argues that ample evidence confirms that Gabrielle Dillow and Andrew Dillow held themselves out to be husband and wife under the applicable federal regulations found in 20 C.F.R. §§ 416.1801 through 416.1835. (DN 15, FLS). Upon consideration, we are forced to agree and therefore the decision of the Commissioner shall be affirmed and the complaint shall be dismissed with prejudice.[2]

## STATEMENT OF FACTS[3]

Plaintiff was born in 1964 with the legal name, Darnell Suzette Spradlin. She began to receive SSI benefits in February 1991 (TR 29) as the result of severe PTSD caused by being repeatedly raped and impregnated as a child by her biological father. (TR 98). In March 1996, Plaintiff legally changed her name first to "Darnell Suzette Dillow" and later to "Gabrielle Suzette Dillow" taking the surname of her roommate Andrew Dillow. (TR 26-27). In December 2012, the Social Security Administration (SSA) discovered that Gabrielle and Andrew Dillow were the joint owners of a checking and savings account with money in excess of the amount for Gabrielle to be eligible for SSI benefits. (TR 42-45, 141-143).

Gabrielle, when questioned by the SSA, reported she had no idea that she and Andrew were the joint owners of Andrew's bank account adding that Andrew was her boyfriend. (TR 45). Andrew Dillow in a letter to the SSA dated December 8, 2012 agreed that Gabrielle had

---

[2] The parties have agreed pursuant to 28 U.S.C. § 636(c) to proceed before the Magistrate Judge by consent as if before the District Court (DN 10).
[3] The statement of facts is taken from the hearing decision of the ALJ, which is not challenged for its accuracy as opposed to its sufficiency.

2

been his "on and off girlfriend for many years." Andrew explained that he had added Gabrielle to his bank account several years earlier so that she could put gas in his car when she ran errands for him. Andrew denied that Gabrielle wrote checks on the account, adding that she only used his credit card when they were together. When the couple learned of the impact of the joint bank account on her eligibility for SSI benefits, they removed her name from all of Andrew's bank accounts so that Andrew was the sole owner of the affected checking account. Consequently, the SSA, which at that point had initially determined that Gabrielle had been overpaid by $8,328 in SSI benefits, waived recovery of the $8,328 overpayment after it determined that Gabrielle was not at fault. (TR 45, 46-51, 54).

Several years then passed. Later, in March 2014, the SSA discovered that not only had Gabriel shared a joint bank account with Andrew, but she had changed her last name to Dillow in 1996. (TR 26-27, 58-68). The SSA also learned that Gabrielle and Andrew jointly-owned a home and an automobile. (TR 133, 139). Further, Andrew for the past several years had claimed Gabrielle as his dependent on his federal income tax returns. (TR 29, 33, 38). Gabrielle confirmed at the time that she jointly owned a home in Irvington, Kentucky with Andrew and that they had lived together in the home since April 2009. (TR 133). Gabrielle also confirmed that she, along with Andrew, jointly owned a 2012 Honda CRZ worth $12,625. (TR 139). Finally, Gabrielle informed the SSA representatives that she had legally changed her surname in 1996 to Dillow because, if she had married Andrew, she would have lost her SSI and Medicaid benefits. (TR 74). Tax records confirmed that Andrew claimed "Darnell S. Dillow" as a dependent tax exemption on his federal tax returns in 2010-2012 during which time he reported his total income to be $36,610, $59,688 and $58,273, respectively. (TR 29, 33, 38).

3

Gabrielle and Andrew both completed an SSA marital relationship questionnaire on March 31, 2014. (TR 69-70, 72-74). In their responses they indicated that they introduced each other to friends and family members as "girlfriend," "boyfriend," or "fiancé." (TR 69-70). Gabrielle denied that she and Andrew had a "holding out" relationship by which they held themselves out to be husband and wife. (TR 58-62) The SSA, however, determined that the above-described evidence contradicted Gabrielle's denial. (TR 73-79). Accordingly, the SSA made a determination that in December 2012 Gabrielle and Andrew had been holding themselves out to be in a spousal relationship for the past two years so that Andrew's income would be deemed to Gabrielle. (Id.). The result was that the SSA determined that Gabrielle had been financially ineligible for SSI benefits due to the fact that her income as deemed since December 2010 had exceeded the maximum amount allowed for SSI recipients.

In April 2014, the SSA notified Gabrielle that her SSI benefits would be ending effective May 2014 for the reasons explained above. (TR 80-86) Also, the SSA advised Gabrielle that it planned to reopen its prior December 2012 determination to make a corrected determination that the holding out relationship had existed since December 2010. (Id.) The SSA notified Gabrielle at that time that she had been overpaid $28,542 in SSI benefits from December 2010 through April 2014.

Gabrielle filed a request for reconsideration of these determinations regarding the alleged overpayment and the cessation of her SSI benefits. (TR 90-92). She additionally requested that her SSI benefits continue to be paid pending the outcome of her appeal. After the SSA reconsidered the evidence, it affirmed its prior determination that Gabrielle and Andrew were holding themselves out as husband and wife so that Andrew's income would be deemed to be hers for the purpose of calculating her eligibility for SSI benefits. (TR 94-95).

4

Gabrielle then filed a request for a hearing by an administrative law judge. (TR 101). By letter of May 7, 2014, the date of her hearing request, Gabrielle explained that she and Andrew were not romantically involved as Andrew was gay and she had no interest in sexual relations due to her lengthy history of childhood sexual abuse by her father and a former husband. (TR 98). Andrew in separate letters of the same date similarly advised that he was a homosexual and had merely used his cohabitation with Gabrielle as a form of "shield" to prevent the disclosure of his true sexual orientation to his family members and coworkers. (TR 99). Andrew added that their arrangement also prevented Gabrielle's abusive father and her other family members from interfering with her. (Id.) Andrew explained that he and Gabrielle did not sleep together. Finally, he protested as being "mean and cruel" the efforts of the SSA to recover the alleged overpayment of SSI benefits and strongly denied that he considered himself to be, or that he held himself out to be, married to Gabrielle. (TR 100).

An administrative hearing was held on August 6, 2014. (TR 158-194). Gabrielle testified that she previously co-owned the banking account with Andrew and that her monthly SSI payments were directly deposited and used by Andrew to pay the $600 monthly mortgage on their home. (TR 173). Gabrielle testified that she had removed her name from the joint account, and that the couple had sold their jointly owned home in Irvington, in an effort to address the concerns of the SSA. She also had attempted to remove her name from the automobile loan, but the lending bank had refused her request to do so.

By way of explanation, Gabrielle testified that she and Andrew had jointly purchased the Irvington home and the Honda automobile because her credit rating enabled them to obtain the necessary loans, while Andrew had the current income to satisfy the loan payments, if not the credit rating to obtain the loans themselves. (TR 170, 172-73, 174-75).

Gabrielle further testified that she changed her last name to Dillow in 1996 because she did not want to keep the last name of her ex-husband nor that of her biological father, both of whom had sexually abused her. (TR 159, 168-170). Consequently, she chose the name of her best friend and roommate Andrew Dillow to help her hide from her former abusers. (Id.). Gabrielle denied that she and Andrew had ever introduced one another to anyone as husband and wife, rather she referred to Andrew as either her friend or her boyfriend. (TR 176-77). According to Gabrielle, she and Andrew had never had a sexual relationship and, in fact, Andrew had an out-of-town boyfriend that he occasionally visited. (TR 177-79).

Based on the above findings contained in the hearing decision (TR 15-25), ALJ Lassy ultimately found that Gabrielle and Andrew indeed were in a "holding out" marital relationship from December 2010 through April 2014. (TR 24). While the ALJ was "not unsympathetic to the non-financial reasons that Gabrielle and Andrew [had] . . . chosen to live together," ALJ Lassy nevertheless found that

> the financial details of this relationship, specifically the joint-ownership of a home, automobile, and bank account during the period of overpayment, demonstrate the very essence of why the income of one individual in a marital or 'holding out' relationship is deemed as income of the other individual when the SSA determines an individual's financial eligibility for SSI benefits.

(DN 9, Administrative Record (TR) 23).

Put differently, ALJ Lassy explained that "basically, the income of both individuals, in this case, Gabrielle's SSI benefits and Andrew's earnings, are being used in combination for the benefit of Gabrielle and Andrew as a 'couple.'" (Id.). The ALJ continued to find that the fact that the couple had removed Gabrielle's name from the bank account and the mortgage did not change the fact that they had been living together and presenting themselves as a couple to the community since at least 1996 when Gabrielle had legally changed her name to Dillow. (Id.).

6

The ALJ found it significant in that respect that Gabrielle in her communications with SSA representatives in early 2014 admitted that she would have legally married Andrew in 1996, but that such a marriage would have caused her to lose her SSI and Medicaid benefits, which is why she chose to legally change her surname to Andrew's surname. (Id.). Citing 20 CFR 416.1806, ALJ Lassy specifically found that:

1. **A holding out relationship did exist between the claimant, Gabrielle Dillow, and her male friend and roommate, Andrew Dillow, during the period of December 2010 through April 2014. (20 CFR 416.1806).**

2. **The income of Andrew Dillow is deemed to the claimant, Gabrielle Dillow, for the purposes of determining financial eligibility of Title XVI Supplemental Security Income. Therefore, the claimant's monthly income exceeded the amount allowed for SSI beneficiaries during the period of December 2010 through April 2014.**

3. **The claimant was overpaid benefits in the amount of $28,542.00 during the period December 2010 through April 2014. (20 CFR 416.537(a)).**

4. **The claimant is liable for repayment of $28,542during the period December 2010 through April 2014. Gabrielle sought review of the hearing decision by the Appeals Council. (20 CFR 416.535(a), 416.560, and 416.570)**

(TR. 24, Hearing Decision at p. 7).

Dillow requested review of the hearing decision by the Appeals Council (TR 12-13). After the Appeals Council granted her an extension of time, and received additional evidence, it ultimately denied Dillow's request for review. (TR 5-8). In doing so, it found that the additional information did not provide a basis for changing the decision of the ALJ made pursuant to 20 C.F.R. §§ 416.1806, 416.1826, Program Operations Manual System (POMS) SI 00501.150(B)(1) and POMS SI 00501.152. (TR 6). The present lawsuit then followed. (DN 1, Complaint).

## LEGAL ANALYSIS

### A.

The arguments raised by Dillow in her motion for summary judgment are governed by the language of 20 C.F.R. §§ 416.1806 and 416.1826 (2014), along with the interpretive provisions of POMS SI 00501.152. The first regulation, § 416.1806 governs how the SSA determines whether a claimant is married and who is the claimant's spouse. 20 C.F.R. § 416.1806. It provides that:

> (a) We will consider someone to be your spouse (and therefore consider you to be married) for SSI purposes if—
>
> > (1) You are legally married under the laws of the State where your and his or her permanent home is (or was when you lived together);
> >
> > (2) We have decided that either of you is entitled to husband's or wife's Social Security insurance benefits as the spouse of the other (this decision will not affect your SSI benefits for any month before it is made); or
> >
> > (3) You and an unrelated person of the opposite sex are living together in the same household at or after the time you apply for SSI benefits, and you both lead people to believe that you are husband and wife.
>
> (b) if more than one person would qualify as your husband or wife under paragraph (a) of this section, we will consider the person you are presently living with to be your spouse for SSI purposes.

20 C.F.R. § 416.1806 (2014).

The second regulation, § 146.1826 (2014), pertains to the showing to be made by claimants that they are not married when they apply for SSI benefits. *Id.* Ordinarily, proof of non-marriage will be unnecessary if the claimant does not live with an unrelated person of the opposite sex and advises the SSA that he or she is not married. 20 C.F.R. § 146.1826(a) (2014).

If, however, the claimant is living with an unrelated person of the opposite sex, then the exception to the presumption of non-marriage is controlled by the language of subsection (c) of the regulation. This subsection of § 416.1826 provides that:

(c) Exception: If you are living with an unrelated person of the opposite sex.

> (1) If you are living with an unrelated person of the opposite sex, you and the person you are living with must explain to us what your relationship is and answer questions such as the following:
>
>> (i)What names are the two of you known by?
>>
>> (ii) Do you introduce yourselves as husband and wife? If not, how are you introduced?
>>
>> (iii) What names are used on mail for each of you?
>>
>> (iv) Who owns or rents the place where you live?
>>
>> (v) Do any deeds, leases, time payment papers, tax papers, or any other papers show you as husband and wife?
>
> (2) We will consider you married to the person you live with unless the information we have, including the answers to the questions in paragraph (c)(1) of this section, all considered together, show that the two of you do not lead people to believe that you are each other's husband and wife.

20 C.F.R. § 416.1826 (2014). *See, Dutko v. Colvin*, No. 15-CV-10698, 2015 WL 6750792 at * 1-2 (E.D. Mich. Nov. 5, 2015)(discussing both §§ 416.1806 and 416.1826 to affirm the "holding out" decision of the Commissioner, in part, based on the fact that the claimant and her boyfriend had lived together for approximately 20 years, that claimant relied on her boyfriend for money, that the claimant and her boyfriend purchased a house together with both their names on the mortgage and deed, and claimant's boyfriend provided her with health insurance through his job).

9

The Program Operations Manual System at SI 0050 1.152 sets out examples of how the above two regulations are to be applied when two people of opposite sex live together.  As Dillow correctly points out, SI 0050 1.152 provides four different examples of varying situations where to unrelated adults live together in the same household, some of which constitute "holding out," and some of which do not.  These examples include the following:

> **Example 1**: The two people deny a marital relationship but rent an apartment together. They do not have joint bank accounts, but they "share activities" and "live together for economic reasons." Finding: not "holding out".  SI 00501.152 D(l).
>
> **Example 2**: The home mortgage is in one of the person's name. The neighbors refer to the two people as a married couple. The two file their taxes as "Married Filing Jointly." The two also share the same charge accounts. Finding: "Holding out". SI 00501.152 D(2).
>
> **Example 3**: The man signs a statement that he and the woman hold themselves out as a married couple. The woman denies that she holds themselves out as married. The lease shows both of their names and there is no other evidence that they present themselves as married. Finding: not "holding out." SI 00501.152 D(3).
>
> **Example 4**: The two hold themselves out as married for 15 years. The man tells SSA that he no longer considers himself married but is staying with the woman temporarily for "financial reasons." The woman confirms that the man is now living in the basement and will move out when he is financially able. She shows that their joint bank accounts have been dissolved.  Finding:  not "holding out." SI 00501.152 D(4).

POMS SI 00501.152 D(4). See gen., § 7:31.Husband and wife status, 1 Soc. Sec. Disab. Claims Prac. & Proc. § 7:31 (2nd ed.)(discussing husband and wife status in the context of disability claims).

**B**.

Dillow now argues that the Commissioner erred in two different fashions: first, by her failure to apply the "relationship" test of 20 CFR 416.1826.  Dillow explains that ALJ Lassy looked only to the economic relationship between Gabrielle and Andrew instead of adequately

10

addressing the true basis for the couple's relationship – – the "obvious" reason to use the language of the POMS. Gabrielle argues that the obvious reason that she and Andrew lived together was in order "to protect their identities [and] to hide themselves from their families and their community." (DN 12, Motion at p.18). She adds that while their relationship might indeed be an unusual one, the examples set forth in the POMS, while not binding law, confirm that a relationship such as that between Gabrielle and Andrew is not a "holding out" of a marital status. Gabrielle concludes on this point that if the Commissioner had simply followed her own examples in the POMS SI 00501.152 D(4), Andrew's income would never have been deemed hers and she, a mentally-challenged woman with chronic, severe PTSD from years of extreme sexual abuse, would not now be held to owe the Commissioner $28,542 in overpaid SSI benefits.

In her second argument, Dillow insists that substantial evidence does not support the finding that she and Andrew were holding themselves out as husband and wife. While she concedes that they "were involved economically . . . these economic involvements did not benefit either one of them financially." (DN 12, Motion at p.18). Mere ownership of assets such as a home or an automobile, according to Dillow, of itself does not prove a "holding out" relationship. Had the ALJ taken into account "the totality of their relationship," as she was required to do by regulation, Dillow concludes that the outcome of the administrative proceedings would have been dramatically different. As matters stand, Dillow reiterates that there is simply not substantial evidence in the record to support the challenged findings of the Commissioner even if the regulations were properly applied. (Id. at p. 19).

The Commissioner responds that ALJ Lassy properly evaluated the factors of 20 C.F.R. § 416.1826(c) to conclude that Gabrielle and Andrew were in a "holding out" marital relationship. (DN 15, FLS at p. 7). The Commissioner points out as support for this conclusion first that

Gabrielle legally changed her surname to "Dillow" in 1996 only later to explain that she was aware that if she had actually married Dillow she would have lost her SSI and Medicaid benefits. (TR 23, 74). She and Andrew later opened a joint checking account that Gabrielle initially acknowledged had been used to deposit her monthly SSI benefits, which themselves were then used to pay the couple's $600 monthly mortgage payments (TR 20-22, 173, 175). Since 2008, Andrew and Gabrielle had lived together continually in their jointly-owned home in Irvington, Kentucky. The deed for the same property furthermore identified the couple as being "husband and wife." (DN 133). Their CRZ Honda automobile also was jointly owned by them. Andrew even claimed Gabrielle on his 2010-2012 federal income tax returns as his dependent.

The Commissioner insists that Gabrielle's argument that she and Andrew "derive no financial benefits" from their relationship is "misguided and completely ignores the overwhelming evidence [that they] . . . held themselves out as a married couple in part for their own financial gain." (DN 15, FLS at p. 7.). According to the Commissioner, their joint checking and savings account allowed the couple to avoid maintenance fees with higher balances and earn higher interest rates on pooled money. Andrew, for example, was able to obtain a $3,650 annual exemption on his taxes. By owning their home jointly, they shared the cost of mortgage payments and divided the cost of utilities. By being listed as husband and wife on the deed, the Dillows obtained "such benefits as the right of survivorship, capital gains exemptions, and avoidance of inheritance tax." (DN 15, FLS at p. 8). Likewise, the Commissioner points out that by sharing a vehicle, Andrew and Gabrielle shared the costs of acquiring and maintaining it. (Id). Indeed, as Gabrielle acknowledged, her superior credit rating, when combined with Andrew's annual income, permitted the couple to obtain and service loans that individually neither might have qualified to get.

Thus, regardless of what other reasons led Gabrielle and Andrew to live together, i.e. mutual safety, the Commissioner now insists that the overwhelming evidence shows that the couple had an ongoing relationship as a *de facto* married couple that existed for their mutual financial benefit. Such a conclusion the Commissioner maintains is reflected in the substantial evidence that "they shared all of the important indicators of a married relationship – – home, car, and bank accounts. The fact that they did not share a legal marriage, because they did not want to risk having Gabrielle's SSI benefits terminated, is simply further confirmation that the decision of the ALJ is not merely supported by substantial evidence, but is entirely correct based on overwhelming evidence.

## C.

Neither party disputes the liberal standard of review to be applied to decisions of the Commissioner. Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but

must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

Dillow correctly points out that the Commissioner is bound by the terms of the applicable federal statutes and regulations such that the failure of the Commissioner to abide by its own regulations will warrant reversal when a claimant is prejudiced as a result, even if the legally errant decision was otherwise supported by substantial evidence. *Bowen v. Comm'r*, 478 F.3d 742, 746 (6th Cir. 2007). *See gen. Buchanan v. Apfel,* 249 F.3d 485, 492 (6th Cir. 2001) (Commissioner has a clear, nondiscretionary duty to comply with her own regulations.). On the other hand, the Commissioner's interpretation of law is entitled to substantial deference. *Whiteside v. Sec. of H.H.S.*, 834 F.2d 1289, 1292 (6th Cir. 1987). That interpretation, unless plainly erroneous or obviously inconsistent with the affected regulation, nevertheless will control. *Atrium Medical Center v. U.S. Dep't. H.H.S.,* 766 F.3d 560, 566 (6th Cir. 2014) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997). While the provisions of the POMS procedure manual used by SSA employees to apply the federal regulations do not carry the force

and effect of law, such provisions are "nevertheless persuasive." *Bowden v. Berryhill,* 2017 WL 2434536 at *12 (E.D. Ky. June 5, 2017) (citing *Davis v. Sec. of H.H.S.,* 867 F 2d 336, 340 (6th Cir. 1989)).

**D.**

After substantial consideration of the well-drafted arguments of the parties, the Court cannot hold that the decision of the Commissioner is contrary to law or that it is unsupported by substantial evidence. It is neither. To the contrary, the hearing decision of ALJ Lassy is thorough in both its recitation and its consideration of the facts and correct in its application of the governing regulations. The ALJ has not misapplied 20 C.F.R. §§ 416.1806 or 416.1826. The ALJ properly considered (1) whether Andrew and Gabrielle had held themselves out as being married, and (2) whether they had derived a financial benefit from their arrangement. The affirmative answer to both of these questions is clear-cut from the testimony and documents before the Commissioner.

Clearly, Andrew and Gabrielle held themselves out to be married. Any doubt about that conclusion is put to rest, first, by the express language of the deed to their jointly-owned Irvington, Kentucky home – – a deed that names of both individuals and immediately thereafter explicitly identifies them as being "husband and wife." (TR 133). Then, there is the undeniable circumstance that Gabrielle in 1996 legally took the surname of her long-time boyfriend Andrew Dillow, later admitting to SSA representatives that she was aware that if she had married Andrew her eligibility for SSI benefits and Medicaid would be called into question. (TR 23, 74).

After taking Andrew's surname, Gabrielle proceeded from 2008 onward to jointly own and occupy their home in Irvington with Andrew. The couple jointly owned their Honda automobile, which was titled in both of their names. Gabrielle explained at the hearing that she

had the better credit rating and that Andrew had the better income; thus, implying with her hearing testimony that by working together they could qualify for loans that Andrew would not otherwise qualify to obtain and could afford to make loan payments that Gabrielle otherwise could not afford to pay herself. (TR 22, 170-171, 172). The mere fact that the couple may have had other reasons to cohabitate, beyond the obvious financial benefits mentioned above, does not negate the financial advantages that resulted from their holding themselves out to be a married couple. To claim otherwise, is simply to blink in the face of the reality of their situation as reflected in the overwhelming evidence of record.

Any doubt about this conclusion is quickly removed by cases such as *Dutko v. Coleman*, No. 15-CV-10698, 2015 WL 6750792 at *1-2 (E.D. Mich. Nov. 5, 2015) another overpayment case. In *Dutko*, the claimant Robin Dutko challenged the denial of her application for SSI benefits. *Id*. at *1. The Commissioner found Dutko to be ineligible for SSI benefits because she was deemed to be married and her household income, as such, exceeded the limitations for benefits. *Id*. Dutko went before the District Court to challenge the finding that she was deemed to be married.

Evidence taken at the administrative hearing revealed that Dutko, who was divorced, had been living with her boyfriend, Dan Belcher, for approximately 20 years and "that she relies on him for money, that they live together as girlfriend-boyfriend, that they do not consider themselves 'domestic partners,' that they never held themselves out as being married, that since 2004 Dutko had health insurance through Belcher's work, and that she and Belcher had purchased their house together in 1988 with both of them on the mortgage and the deed to the property. *Id*. Finally, when Dutko applied for SSI benefits she indicated that she and Belcher

16

"present ourselves to others as husband and wife" and that Belcher is her "spouse." Faced with these circumstances, the District Court for the Eastern District of Michigan held that:

> On this record, the ALJ could reasonably find that plaintiff and Belcher were married for SSI purposes because they had been living together for an extended period of time, they jointly took out a mortgage loan and jointly purchased the home where they lived together, and plaintiff was covered by Belcher's insurance through his health plan at work. On the latter point, the Court takes judicial notice of the fact that such insurance coverage cannot be extended to unrelated third parties, but only to family members, including spouses and domestic partners. Additionally, when plaintiff applied for SSI benefits she indicated that she and Belcher "present ourselves to others as husband and wife" (Tr. 34, 44) and that Belcher is her "spouse" (Tr. 34). While plaintiff now denies having made these statements, the application summary (Tr. 33-43) and "review statement summary" (Tr. 44-53) both advised plaintiff to review all of the information contained therein and, in the event they contained any errors, to "contact us within 10 days after receiving this summary to let us know" (Tr. 33, 44). There is no indication in the record, and plaintiff does not contend, that she ever corrected the statements in her application summaries that she and Belcher held themselves out as being married or that Belcher was her spouse. For these reasons, the Court concludes that the ALJ's decision is supported by substantial evidence

*Dutko v. Colvin*, No. 15-CV-10698, 2015 WL 6750792, at *3 (E.D. Mich. Nov. 5, 2015).

The same holding applies with equal force here. While it is true that Gabrielle did not identify Andrew as her "spouse" on her SSI-related documents, she nonetheless clearly expressed her intent with regards to her relationship with Andrew when she conceded that she took Andrew's surname because she knew that to marry Andrew would adversely affect her eligibility for continued SSI benefits and Medicaid.

Further, just as in *Dutko*, Gabrielle and Andrew were identified on the deed to their jointly-owned home as being "husband and wife," a circumstance that Gabrielle in her motion for summary judgment does not mention much less attempt to distinguish. The unalterable facts of record show that: Gabrielle intentionally took the surname of her boyfriend; that the two cohabitated for years in a home that they jointly owned; they shared an automobile that they also jointly owned; and, they jointly owned bank account-- all of which reflected the names of the

17

owners as being Gabrielle Dillow and Andrew Dillow, a circumstance which of itself would lead the ordinary person to believe that a marital relationship existed.

As a consequence of this ongoing arrangement, the couple received numerous financial benefits. They obtained home and auto loans that individually they either could not have obtained or have financially serviced individually. They received the benefit of shared costs of living, as well. All-in-all their relationship runs directly to the heart of why regulations such as 20 CFR §§ 416.1806 and 416.1826 exist, as ALJ Lassy insightfully noted in her hearing decision (TR 23).

Finally, it is noteworthy that Gabrielle cites no federal court decision, published or unpublished, that rejects the decision of the Commissioner in an overpayment case based on "holding out" under remotely similar circumstances. There is no such case law. The Court has looked diligently and can find no judicial decisions to support Gabrielle's position. Even the cited POMS SI 00501.152 D(4) is readily distinguishable. Example 4 of the POMS, the example relied on by Gabrielle, is forward looking in that the determination of "not holding out" applies to the circumstances *after* the dissolution of the couple's joint bank account; whereas here, the Commissioner's ruling is retrospective for a closed 4-year time period when all of the circumstances discussed above applied to both Gabrielle and Andrew.

Accordingly, because the decision of the Commissioner correctly interprets the controlling regulations and is supported by overwhelming evidence, the Court shall affirm the decision and dismiss the complaint with prejudice by separate, final order.

Cc: Counsel of Record